Our next case is ABS Global, Inc. v. Cytonome, ST, LLC and this is document number 22-1761. Mr. Hurwitz, you have reserved five minutes of your time for rebuttal. That's correct. Okay, so you may begin. Thank you, Your Honor, and may it please the Court. The core of this case comes down to a simple question of claim construction. When the patent says, a sample stream, does that mean one and only one stream? Or does it mean one or more streams? Two rules of claim construction independently point to the same answer. The first is the general rule that when a patent says A, it means one or more. This Court has said that that rule is subject to extremely limited circumstances when the patentee evinces a clear intent to limit A to just one. Second is that when a patentee acts as a lexicographer, the patentee's definition controls. In this case, the patentee chose explicitly to define A in the specification to mean one or more or at least one. Whether you apply the general rule of claim construction or the specific definition in the patent, when the patent says A sample stream, that means one or more sample streams. As a result, the Board applied the wrong construction. The decision below should be reversed. Can I just ask, so taking what you just said as an assumption that there's a pretty strong preference for that, address what I think is the major reason that the Board said otherwise, which is the centerline language of claim two. And I understand, of course, that it says A centerline. It doesn't say the centerline, although sometimes in the briefing here that's been misquoted. Why is that not a sufficient reason to overcome the two claim construction principles that you recited would otherwise favor? So let me first frame the question, which is one of the principles is not merely contextual or a presumption, but it actually requires the definition. Overcoming lexicography requires clear disavowal. So a mere contextual suggestion that the better reading might be a singular centerline for a singular stream is not sufficient. That's why I think I would have started with the lexicography and not with the A and background principles. We view them as both sufficient, but the lexicography, I agree, is stronger. So let's go to why A centerline doesn't overcome that, doesn't constitute a disavowal. A couple of reasons. First, you already mentioned it. A centerline in the context of this patent means at least one centerline. So you can read that claim, and it makes perfect sense to say to require at least one centerline with respect to which focusing fluid is introduced symmetrically for at least one sample stream. There's nothing unusual about that, nothing impossible about that. You just ask the question, are there equal amounts of focusing fluid added left and right of one of the defined lines, however you define them? It's totally possible. That's contrasted with asymmetric introduction of sheet fluid, which is also common. We show at page 39 of the blue brief, sometimes you do both at the same time in equal amounts, sometimes you do just one. That's all this claim is requiring, and it's perfectly consistent whether it's a single stream, multiple streams, or a split stream that is a single stream with a gap in the middle. The second reason is that even if you say there's got to be just one centerline and it's got to go through the middle, it still doesn't exclude a split sample, which is different from multiple independent samples, and in SIMONE what we have is a single stream with a gap in the middle, assuming the board is right about how to read 3A and 3B. Just focusing on 3B of SIMONE on page 2121 of the joint appendix, what SIMONE itself says is that, describing that gap, it says, the stream, singular, is split into two parts with a gap in the middle, i.e., in the middle of the stream. Now, that means SIMONE is teaching you, there's the centerline, right in the middle. The fact that it doesn't touch the sample doesn't make it any less the center of the sample stream, just as the fact that the center of a donut doesn't touch a donut means that it's not the center. It's still the center as defined with respect to the sample stream that has a gap in the middle. And throughout SIMONE, it discloses that it's focusing the sample stream, 3A, 3B, and throughout. The abstract refers to the sample stream. In 2121, we're talking about the gap. What does it say? At the end of that paragraph, the one about when the gap emerges and when it doesn't, it says, in 3B, what you see is a reduction in particle flux for the same spatial confinement of what? Of the focused stream. In the discussion section of 2126, it refers repeatedly to the focused stream, the stream that has, you can adjust the shape, it has consistent uniform particle flux. So just so that I understand, this argument that you're making, which is in the brief, is that just an argument that even without altering the claim construction, SIMONE shows a single stream? It's actually, it affects both that argument as well as the claim construction argument because it shows that at least with the context of it, understanding multiple streams in the context of a split stream, you still have a center line if the total sample stream can have a defined middle. Now, as we see it, the better way to read claim two, to affect claim one, is that a center line means one or more center lines, and that, as you said, is the core of the board's analysis, and that's, the board was wrong to understand that a center line had to be just one. But even if it has to be just one in claim two, multiple sample streams, or a split sample at the very least, can have a center line. So a sample in claim one can be multiple streams as well. So that's how we view it as claim construction. We also think, independently, the court can reach the same result by saying the board's construction, excuse me, the board's application of its construction lacks substantial evidence. Now, I think it is important to note Can I ask you a question about, is it Simonet? How do you pronounce his name? I say Simonet. I know he's French. Okay. When Simonet refers, well, first of all, there's 3A and 3B. Do I understand correctly, I don't know if you know what I'm talking about, there are a couple of paragraphs in, is it Dr. Arnold, is that the other side's expert? Yes. That says some stuff about 3A, which almost certainly is typographical. He was really referring to 3B. Because he's only showing the 3B picture. If this isn't from any... I think I may know what you're talking about, but I couldn't pull it from Cole, but what I think what's going on, he's showing just 3B, and he talks about 3A. The way I read it is that he's really talking about 3A, and he's not putting it in the declaration, because if you look at 3A, it's hard to say that there's actually multiple... I couldn't find any answer to the following question. Does anybody talk about what it means to have a residual gap? Yes. When I read those words, I'm trying to picture, the stream is coming down in C and A, and at some point it was separate, and then it comes back together, but there's still some little gap kind of down at the bottom, even though it is topologically connected. In a way, the 3B was not topologically connected, because there's squeezing fluid that's running right through the center. Yes. I believe it's at 4171 of the Joint Appendix. You'll see that our expert explains what he understands the residual gap of 3A to be talking about, and what he says is, a skilled artisan would have understood, again, 4171, this is in Volume 2 of the Joint Appendix. What he says is, a skilled artisan would have understood the residual gap described in C and A refers merely to the presence of a short notch at the bottom of the image, which I've highlighted below. So he reads it, residual gap, to be sort of, I think, how you do. It's not the same history of it used to be separate, and now it's together, but the point is, it's the residue of what you might have imagined to be a gap, but it's not there anymore. It's like the memory of a gap. It's the notch that's left behind. They did come together. Rivers don't have memories. So either there was once a separation into two pieces that were not topologically connected, and they now are, but there's a piece that hasn't sort of... It reflects the earlier separateness. It's no longer separate, but you can see the evidence. Is that what you understand residual gap to be? That's how I understand it, and I think that's what he's saying, and, you know... But if that was right, and you accept the board's view that single has to be single from entry to inspection station, then 3A meets their test. I don't think that's right about 3A. So I think you have to remember what context in which the disputed claim term arises. The disputed claim term arises in the part of the claim that talks about a fluid-focusing region configured to focus the sample stream. So there might be separateness before the fluid-focusing region. That doesn't... Even if you require there to be single contiguous sample stream, it's not required before or after the fluid-focusing region. The disputed claim term is whether there is a fluid-focusing region that within that region it's configured to focus the sample stream. The separateness, if there is any, is before the sample from port B enters the fluid-focusing region. It comes in from the sides as two separate pieces that come together in the middle in figure 3A. They meet. They re-meet. They're introduced together. They separate for a moment. They come together and meet again. At that moment is where you see the fluid-focusing region. The inlet has a split. The fluid-focusing region is continuous. You know that to be true. The question didn't arise below. There's not a whole lot of... I can't point you to testimony on this. The flows are laminar, which means they're layered. They don't mix. When you see downstream that it's contiguous, that means that it's been contiguous. That is to say the topology you see in figure 3A is the same topology, top to bottom anyway, that you would have seen at the inlets from the sides. If you go to figure 1 of Simene, Simene is... We're talking about 2020-ish. Let me pull it up. 2021, it's figure 3. It's 2119 of Simene. The continuity... We're talking about figure 1, the upper left, 2119. Figure 1C is the clearest indication. In figure 1C, what you see in the fluid-focusing region, which is basically the entire red central stream from where A and B meet in the main channel to the end, it's represented as a single contiguous stream from the intersection of A and B downstream Before B enters the main flow channel, it is coming in as two separate substreams. In the flow conditions that generate figure 3A, which give you that notch at the bottom, but the continuity of a single stream, the pressure from B is sufficiently high that the two pieces meet in the middle. They're not split in half by the sample. In the pressure settings that generate 3B, the two separate streams, the pressure from A is sufficiently high to block the two pieces from joining in the middle. And that's the teaching of 2121, this whole dispute about can you adjust the pressure settings so as to produce or eliminate the split sample? What Simene expressly teaches on its face, and you don't have to look anywhere else, is that you get the gap. The gap occurs when the flow from B is small relative to A, as in B is going to meet in the middle unless you push A really hard, and then it splits into two. 3A shows you it can meet in the middle. That's how we read it, and our expert explains what residual gap means is a notch at the bottom. I describe it as a memory. Yes, it doesn't literally have a memory. It just reflects the fact that previously, before you enter the fluid-focusing region, they're separate. But in the fluid-focusing region, where all of the focusing of the sample occurs, it's continuously a single sample stream. If we were to agree with you on the claim construction but not reach any other issue, would our disposition be to reverse the finding just with respect to Claim 1, or were there any other claims that there was no other issue besides the claim construction? I think that with respect to the dependent claims, I think that the arguments around Claim 2 are essentially collapsing into the arguments around Claim 1, so if you agreed with us on claim construction, I think Claim 2 is straightforward. Claim 8, there is actually no dispute that Simene itself teaches all limitations of Claim 8. If you look at the red brief, the only thing they're disputing is whether one would combine Simene with Kim, a secondary reference. We don't mention Kim because we don't need it. It was an alternative argument. So I think even if you reached literally nothing else, no other questions, reversal as to Claim 1, Claim 8 should fall with it. There's no arguments. I recognize we asked for a lot in terms of relief, 6 and 9. But 2, 6, and 9, there seem to be other issues, including on your view of centerline or on some proper view of centerline, is there the equal flow on both sides? Translate. That's right. 2, 6, and 9 at least have arguments that are distinct. 6 and 9 are more distinct. I think 2 more or less collapses into 1, but you can view it differently. 6, surely, same claim. I haven't mentioned it. It is a different issue. We think it's straightforward, but recognize that the court may be inclined to remand in the first instance, and Claim 9 is an obviousness combination that would have to be considered. Again, the relevant reference, Kumrow talks about combining them essentially, so we think it's straightforward, but again, it would make sense to remand if that were the court's inclination. I saw that I was in my bubble. It's all right. Mr. Chen, you may start. Thank you. May it please the court, Julius Chen for appellee, side or no. I'd like to cover mainly the two issues that my friend on the other side covered today, and those would be Claim 2, which I think is the crux of the claim construction argument, and that I do very much want to address a lot of the characterization that you've heard about Simene, because we do think there are other expert statements in the record that would be competing, and again, this is a substantial evidence question. Let me start with Claim 2. What ABS has really centered on, sorry, pun intended, in its reply brief is this idea that a center line also has to be plural. We don't think that that helps ABS at all, because what they're saying is, well, there could be a center line, and what that means is that you would have the symmetrical introduction of focusing fluid symmetrically, and that would be the configuration with respect to one of a number of center lines, and they suggest several of them. They say you could draw the center lines through both parts of the split sample. You could draw it through one of the split sample, and in our view, what happens then is essentially you are rendering most of Claim 2 superfluous. Again, the claim language is symmetrically with respect to a center line of the sample stream. Our expert, as the board found at Appendix 27, says, well, this is asymmetrical. It is not symmetrical when you have the two sample streams and you have symmetrical introduction. It will be off-center with respect to one of those center lines, and that's what the board credits our expert saying at Appendix 27. But not the one in the middle. That's not where the center line is not running through sample fluid. That's correct, Your Honor, and I think that's a separate argument that they've made, but just to finish on the first one, what I think happens is essentially you could draw an arbitrary line through any part of the channel and say, well, you have symmetrical introduction in their view, which they say is just equal amounts on both sides. But that would be true, again, with respect to... I'm sorry. Why isn't it right to say there are two requirements? One is something has to be a center line, and that's measured with respect to a sample fluid. And then an additional requirement that there have to be equal amounts of the squeezing liquid on either side of the center line, because they're not the same thing. Well, Your Honor, that's their argument with the center line and the gap. That's what I take your question to mean, and I'm happy to go there. So the problem... I guess I took you to be saying you could draw a line anywhere in the sample fluid, but then not any line is going to be a center line. Well, yes, that's our point, Your Honor. It would essentially render... They're just saying it's symmetrical then, right? And so they have essentially two arguments, right? The first argument is that it goes in the gap. I'm addressing what I think is the emphasis of the reply, which says a center line is multiple center lines. You could draw it in a number of places, and the example they use is the figure in Seminary where you have the two split sample streams, right? And so they say you could draw the line through either one of those. And so I'm saying in that argument, that second argument that they say you could draw the lines there in the split sample stream, it would be symmetrical. But then there might be a question of whether Seminary meets the second requirement of Claim 2, namely with respect to either one of those, of symmetrical squeezing fluid on both sides of either line, and just intuitively one may raise an eyebrow about that. Well, all we're saying there, Your Honor, is that that is not symmetrical because it's not symmetrical with respect to the center line of the sample stream. Now, I'm happy to talk about their first argument, which is that the center line would go in the middle of the sample. And I think what you just said, Your Honor, was telling when you asked me the question. You said it would be in the middle of the sample. It doesn't touch sample. But again, the claim language says symmetrically with respect to a center line of the sample stream. Now, Avius and his brief has very carefully worded its arguments to also say it would be in the middle of the sample in a gap. That's not the same... Just to be clear, it seems to me there is a difference between being in the middle of a stream and being in the midst of the stream. That is, if there's a dry section between two forks of the river, the center line of the Potomac runs for a brief period right over Tierra Roosevelt Island. That's true, Your Honor. And I think the difference here is that it's not just a dry section in the middle. What's happening is, in the middle in the gap, there's sheath fluid in the gap. It is all flowing in a laminar way, which means they don't mix together. That is an important principle. Right, I have Tierra Island as the sheath fluid. It's just not the sample fluid. The center line doesn't have to always lie in the sample to still be a center line of the sample. Well, Your Honor, this is the difference between the sample and the sample stream. And I think maybe what is clarifying here is the idea that, in our view, and this is what our expert says, and what the board also draws as distinction at Appendix 25, is that we think that a split sample is not one sample or sample stream. We think it is two distinct sample streams. And the way you know that is there is sheath fluid in the middle. It's not just sort of dry, where you say, well, this continues to be one sample stream. And so on that understanding, which, again, the board adopted, rejecting their expert's argument at Appendix 4181, this is the argument they advanced there, where they said this is in the middle of the sample, in a gap, and the board says, well, you are conflating two concepts here. The sample streams that we see when you have a split, because, as our expert explains, a POSA would understand, when you have a split sample in that way, that those would be two distinct sample streams. That's what our expert says at Appendix 4262. And what ABS is saying, and what its expert is saying, is that, well, no, the way we get around that is just to say that we have a centerline of the sample, not saying that it's in a stream. And so I think going to the claim language, Your Honor, it's symmetrically, again, with respect to a centerline of the sample stream. If there are two sample streams, that centerline is not a centerline of those sample streams. It is just a centerline of what they call the sample generally. And again, the point, as the board adopted it at Appendix 25, and has a finding rejecting their expert's testimony, this is a matter in which there are two distinct concepts, sample and sample stream. On the claim construction question, a sample stream, given what we have described as essentially a rule, that it's almost always one or more, the lexicography and the definitions of the patent itself, I think, it would seem to follow logically that if there's some uncertainty or ambiguity as to how one of skill in the art would read this term in your patent, that the board's construction was incorrect because the rule and the lexicography go against you so strongly. Would you agree with that? We have to be pretty darn sure to go with your side on this issue. Well, Your Honor, I wouldn't disagree about how you're articulating the standard. And look, we're not trying to sort of quibble with the standard here. I think everybody agrees that you have to get to the context and claim two here. But what I would disagree with is the idea that because maybe there's some competing expert testimony on this, then you just go with a default in that way. It's still a question of what a POSA would understand here. That's the exercise. And so there, we don't think that you would apply a different rule necessarily. It's still what a POSA would understand. And here, the board credited our expert of what a POSA would understand over theirs. And it's not just the expert testimony. Again, as I was discussing before, there is the claim language as well, which says a center line of the sample stream. And just taking the claim language on its face, there is a reason why, in their brief, they have to use the center line of the sample. They appreciate that that is not the same thing as the center line of the sample stream. And again, this goes to basic microfluidics. When you have sheath flow in between two sample streams, even if those were originally one and then split, which is not the case, but when you have that, that is a distinct set of sample streams separated by sheath fluid. I know we're not here on infringement, but sometimes it's easier for me to think about infringement. And there is some back and forth in the brief about infringement. Is there a dispute here? They say, for instance, in the gray brief at three, that you're saying infringement is only possible by a device that focuses one single contiguous stream under all possible flow conditions. Is that right? Are you agreeing? Your claims are that narrow? No, no, no. And I want to be very clear about what we're saying. We're responding to a use-based limitation argument, and all we're saying is that you need a configuration to focus one sample stream. We are aligning ourselves with the rest of the case law. This is the Parker Vision case, I think that's discussed in the cases, which says you can have other modes of operation, perhaps, but as long as you have a configuration that is to focus a sample stream, that would be enough for infringement. So it would be very clear. We are not saying what they are attributing to us. All right. I think I understand, but the way I think you put it in the red brief at 3536, if an accused device is not configured to receive only a single sample stream and then focus that same single sample stream, then the device does not infringe the challenge claims. I think I read what you wrote correctly. Sure, Your Honor. Did I get that right? I mean, I don't have any reason to say you read it wrong, but just to be clear, if there's any confusion, I very much want to clear this up. We are not trying to say that it has to always, in any circumstance, under any conditions. That is very much not our position. But I only infringe when it functions in the way that you're setting out here. No, no, no. The key word would be configured. It would have to be configured. So this is the classic example in the court's case law where it talks about how you have a claim that says a car has to be driven in third gear. Perhaps a car can also be configured to drive in gears one, two, and three. It's not necessarily the case that you have to drive it in the third gear, but as long as it is configured in gears one, two, and three and the claim says a configuration for gear three, that is enough because it's a configuration claim. We're focused here on the configuration. We're not talking about the use as part of our construction there. If I can turn to Simone. I mean, do you understand there's, you know, Parker Vision recited the Aspects eyewear case that said configured. Sometimes that has this very broad meaning, like capable of, but often it doesn't. It means something more like, something intent-based about designed to. Sure. Is that the idea that you think applies here to this configured claim? Yes, we think this would be a configured claim as opposed to a capability claim. That's the line that the case law is drawing, I believe. And I think the reason why AVS has made much of this in its brief, even though it hasn't mentioned it today, is it's trying to use this as a grounds to say that there is anticipation here. What it's really arguing is that Simone has different modes of operation. It has a split stream mode and it has a single stream mode. And I want to be very clear here that we don't believe to your question about figure 3A. There is very much expert testimony that 3A has a residual gap, but that residual gap still is a gap. Our entire expert's position, this is at 4253 to 4254, what he is saying is that when you have the figure 1 device that my friend on the other side talked about, you have the stream comes in from port B, it is a branching set of inlets, and so it then has the sample stream go into channel A. I noted at the outset that what Simone says at appendix 2121 is that those streams from channels B do not reach the middle of channel A. And what our expert says is that even when the authors in their experiment try to adjust for flow rates, they cannot close the gap. So there's direct testimony that the board credited here that you would not have a situation in which Simone discloses anything close to a single sample stream mode. Can I ask you a question that I asked before? Do you agree that paragraphs 134 and 135 of Dr. Arnold's, this is 4262 to 4263, I guess, in referring to figure 3A while showing figure 3B and using a quote from Simone that's expressly about 3B that the reference is to 3A there are simply typographical errors? A poster would understand Simone to be clearly depicting a split sample stream in figure 3A, comma, which is an image, colon, here's a picture, and they show 3B, not 3A. And then down below, in short, figure 3A and Simone's description of the particle stream as, quote, split into two parts with a gap in the middle clearly demonstrates something. The quote is from Simone's description expressly of 3B, unless I've got things wrong. That's my understanding. And he is showing 3B here. But elsewhere, as I've been saying, he discussed this 3A and talked about how it would be physically impossible. It is the design characteristic. This is what he says. Because they don't cross. That's correct. That's what was confusing me about this residual distance. I see. What if they were once together? Well, just to be clear, they are not once together. They start as, if you look at appendix 2119, and as. Residual gap, I'm sorry. Once separate, they now join. I don't understand how that fits with Dr. Arnold's testimony that they can't be together. Well, Your Honor, he says that it is the unavoidable product of the figure one design. This is at 4262. He says that it is the design of the device itself, how it's configured, to not allow them to come together. And again, this is just a battle of the experts. The board says that nothing in 3A or 3B shows a single stream. And again, the testimony that I pointed the court to very much says that there is a gap in the middle that continues. And that even when you were to adjust the flow rates, that does not solve the problem. He says this explicitly. It does not create a single sample stream. Thank you, Mr. Chen, for your argument. I'm sure we've got three minutes or so. Three? I'll try to keep it even shorter. Just two points. Judge Stark, you mentioned that ambiguity is not enough. And all they pointed to was the reference to a centerline of the sample stream. The reference in Claim 2 to a centerline of the sample stream is not a clear disavowal of the express definition of A. It's just that simple on claim construction, and that's the end of the appeal as far as I'm concerned. The other thing I wanted to address very briefly is there was some suggestion that we were strategic in our brief by referring to stream as opposed to the sample stream. Excuse me, sample as opposed to sample stream. We may have varied our language. There was nothing strategic about it. We're not afraid of it. Simone says the focus stream, the sample stream, is focused repeatedly throughout. And it is literally a textbook design used to teach undergraduates and graduate students about how hydrodynamic focusing works to focus the sample stream. And they use this language, the sample stream, in the Fulch textbook at 2531 of the Joint Appendix, in the Ligler textbook at 3923-24, the sample stream. In the Frankowski article, it talks about fully controlling the size and position of what? The sample stream. There's nothing, that's not a problem for us. Simone teaches focusing the sample stream. It's configured to focus the sample stream, and it was widely recognized to do so. Thank you. This concludes our argument for the morning. All cases are taken under advisement. Court stands in recess.